IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 4, 2020 Session

## TERRELL K. RALEY, ET AL. V. CEES BRINKMAN, ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 16-196-BC      Ellen Hobbs Lyle, Chancellor**

### No. M2018-02022-COA-R3-CV

This appeal arises from a business dispute between the two members of a Tennessee limited liability company, 4 Points Hospitality, LLC ("4 Points"), each owning a 50% interest. The plaintiff-member, Terrell K. Raley ("Raley"), commenced this action asserting, individually and on behalf of the LLC, *inter alia*, that the defendant-member, Cees Brinkman ("Brinkman"), breached the operating agreement by failing to make a $175,000 capital contribution. Brinkman asserted counter claims, individually and on behalf of the LLC, for breach of contract and breach of fiduciary duty, alleging that Raley misappropriated funds for his personal benefit and that he withheld a large portion of Brinkman's distributions and salary. Brinkman also claimed that Raley was liable for conversion and punitive damages. Brinkman sought to terminate Raley's membership interest because he willfully and persistently breached his fiduciary duty, and because it was no longer reasonably practicable for the two men to continue operating the business. Brinkman also claimed he was entitled to recover his attorneys' fees in accordance with Tenn. Code Ann. §§ 48-249-804 and -805, and the operating agreement. Upon Raley's pre-trial motion, the trial court summarily dismissed Brinkman's claim for attorneys' fees under the operating agreement, holding that the attorneys' fees provision only pertained to disputes submitted to arbitration. Following a lengthy bench trial, the court ruled that (1) Brinkman breached the operating agreement by failing to make a $175,000 capital contribution; (2) Raley was liable for breach of fiduciary duty, breach of contract, and conversion for underpaying Brinkman's distributions and salary and for using 4 Points' funds to satisfy unrelated, personal expenses; (3) Raley was not liable for punitive damages because his conduct was not egregious; and (4) Brinkman was not entitled to attorneys' fees under §§ 48-249-804 and -805. The court also terminated Raley's membership interest in 4 Points in accordance with Tenn. Code Ann. §§ 48-249-503(a)(6)(B) and (C), finding that Raley's wrongful conduct adversely and materially affected the business, and it was no longer reasonably practicable for the members to continue operating the business together. Brinkman filed a motion to alter or amend the court's order, and the court denied his motion in all respects but one, ruling, in accordance with Tenn. Code Ann. § 48-249-805, that Brinkman was entitled to equitable relief in the form of attorneys' fees. Therefore,

the court revised its order to allow half of the $240,275.59 Raley owed 4 Points as reimbursement for personal expenses to be paid to Brinkman, individually. Brinkman then filed notice that 4 Points intended to purchase Raley's membership interest in accordance with Tenn. Code Ann. §§ 48-249-505 and -506, which necessitated an evidentiary hearing to determine the "fair value" of Raley's interest. In preparation for the hearing, Brinkman's expert prepared a valuation report applying shareholder-level discounts for lack of control and lack of marketability and adjusting 4 Points' income for the corporate income tax. Raley responded by filing a motion in limine to determine the meaning and components of "fair value" under Tenn. Code Ann. § 48-249-506(3), arguing that any testimony or other evidence relating to discounts for lack of control and marketability and the corporate income tax should be excluded at the evidentiary hearing. In response, Brinkman submitted the affidavit of his valuation expert, explaining the expert's valuation methodology and the reasons for applying a corporate income tax rate. The court ruled that because the company, rather than a third-party, was purchasing the membership interest, the fact that the interest was non-controlling was irrelevant to its fair value. The court also excluded evidence and testimony on discounts for lack of marketability. As for the applicability of the corporate income tax, the court ruled that "no entity level tax should be applied in the valuation analysis for a non-controlling interest in an electing S corporation, absent a compelling demonstration that independent third parties dealing at arms-length would do so as part of a purchase price negotiation." Following the evidentiary hearing, the court determined that the fair value of 4 Points was $4,774,278.18, and that Raley's 50% interest was $2,387,139.09. Brinkman timely filed this appeal contending the trial court erred in determining that (1) Brinkman breached the operating agreement by failing to make a capital contribution; (2) Raley was not liable for punitive damages; and (3) Brinkman was not entitled to attorneys' fees pursuant to the operating agreement and/or §§ 48-249-804 and -805. As for the trial court's valuation of Raley's membership interest, Brinkman contends the trial court erred in (1) disallowing discounts for lack of control and lack of marketability and (2) determining that tax-affecting did not constitute relevant evidence of the fair value of Raley's membership interest in 4 Points. We affirm the trial court's judgment in every respect but one. We have determined that the trial court erred by failing to consider evidence relative to tax-affecting when determining the fair value of Raley's membership interest, because Tenn. Code Ann. § 48-249-506 provides that relevant evidence of fair value includes the "recommendations of any of the appraisers of the parties to the proceeding." Brinkman's valuation expert stated in his affidavit that the application of a 38% tax rate "comports with generally accepted valuation standards and methods" and reasoned that, there is a risk of inaccurate valuation when the components of the capitalization rate are based on after-tax values, and no tax-affecting is applied to the income of the company. Therefore, we vacate the judgment valuing Raley's interest and remand for the trial court to consider evidence relative to tax-affecting in determining the fair value of Raley's membership interest and to enter judgment accordingly.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in part, Vacated in part, and Remanded**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which THOMAS R. FRIERSON II, and W. NEAL MCBRAYER, JJ., joined.

W. Scott Sims and Michael R. O'Neill, Nashville, Tennessee, for the appellant, Cees Brinkman.

Seth McInteer and Howell O'Rear, Nashville, Tennessee, for the appellee, Terrell K. Raley.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

When Raley and Brinkman met in 2009, Raley had been working in the restaurant industry for a number of years, and Brinkman owned Brinkman Holdings, LLC ("Brinkman Holdings"), which owned two commercial properties located on the corner of McFerrin Avenue and West Eastland Avenue in East Nashville. Upon learning that Brinkman stored used restaurant equipment at the West Eastland Avenue property, Raley contacted Brinkman to inquire about the equipment. During their discussions, Raley expressed an interest in starting his own restaurant, and Brinkman expressed an interest in having a restaurant as a tenant.

When the two men decided to go into business together, they first formed TC Hospitality, Inc. to own and operate the Holland House Bar and Refuge ("Holland House"). Brinkman Holdings entered into a lease with TC Hospitality and agreed to cover the cost of converting the West Eastland Avenue property to a restaurant in exchange for Brinkman's 10% ownership in TC Hospitality and $5,000 in monthly rent. Holland House opened in 2010 and was fairly successful.

Thereafter, Brinkman and Raley decided to open a second restaurant called The Pharmacy Burger Parlor & Beer Garden ("The Pharmacy"). They formed a separate business entity, 4 Points, to own and operate The Pharmacy, with each of them owning a 50% membership interest in 4 Points.

The operating agreement[1] required Raley to make an initial capital contribution of $30,000 in labor and required Brinkman to contribute $175,000 in cash. It also provided that they would be 50/50 owners of 4 Points and that Brinkman and Raley were entitled to an even split of net profits. Raley was designated the managing member, and the agreement provided that he would "take responsibility for the administrative duties and ministerial

---

[1] The agreement was titled "Partnership Agreement," but the parties do not dispute that it was an operating agreement and that 4 Points was registered with the Secretary of State as a limited liability company.

functions" of the restaurant and "make day-to-day business decisions on his . . . own accord, subject to Acts Requiring Majority Consent[.]" Raley's responsibilities included, *inter alia*, responsibility for expenses, payroll, and the distributions of net profits to himself and Brinkman. The agreement also stated that both members shall maintain the books "and shall make proper entries in such books of all sales, purchases, receipts, payments, transactions and property" of the LLC. The operating agreement provided that "working capital and other funds" received by the LLC be deposited in accounts "which shall be kept separate and apart from any other individual accounts of the [members]." 4 Points elected to be taxed as an S corporation.[2]

Neither party disputes that they also entered into an oral salary agreement; however, the terms of the salary agreement were disputed. Raley claimed that, per their agreement, he would receive a salary of eight percent of gross sales and Brinkman would receive a salary of four percent. Brinkman claimed that Raley would receive eight percent "gross" and he would receive four percent "gross" with an additional four percent set aside in a separate account for the development of other restaurants.[3]

Shortly after forming the company, 4 Points and Brinkman Holdings entered into a lease whereby 4 Points would pay a rent of $2,500 per month and Brinkman Holdings would provide a "build to specification operational restaurant and parking."

The Pharmacy opened to the public in December 2011, offering full-service, casual dining specializing in craft burgers, German wurst, beers, old-fashioned milkshakes, and cream sodas. The Pharmacy was very successful. In its first year, it realized approximately $1.9 million in gross income, and by 2016, its gross income rose to approximately $3.4 million. Raley and his managers primarily handled the bookkeeping of the restaurant. Additionally, Raley hired an accountant to perform "write-up services," which meant that the accountant's oversight of the company's finances was limited.[4]

The relationship between Raley and Brinkman began to deteriorate in March 2015, shortly after Raley opened Butchertown Hall, a restaurant Raley owned separately from

---

[2] The taxable income of an S corporation is "computed in the same manner as in the case of an individual." 26 U.S.C.A. § 1363. As such, an S corporation acts as a non-taxable "pass through" with each owner paying taxes on the corporation's income via his or her individual returns in accordance with the owner's proportionate share of the business. *See* 26 U.S.C.A. § 1366.

[3] At the trial, Brinkman testified that the oral agreement was based on "gross" but did not specify if it was based on gross sales or gross income.

[4] Joe England, 4 Points' accountant, testified at the trial that he was retained to provide "write-up services," and his oversight of The Pharmacy's finances was limited.

Brinkman.[5] Suspecting that The Pharmacy was paying Butchertown Hall's employees and other expenses, Brinkman questioned Raley about The Pharmacy's finances, which led to further conflict. Raley claimed their relationship reached an impasse when Brinkman Holdings refused to renew The Pharmacy's lease. After a period of time, Raley and Brinkman quit communicating with one another and hired attorneys to speak for them.

## A. THE PLEADINGS

In February 2016, Raley filed a complaint in Davidson County Chancery Court.[6] In April, Brinkman filed an answer and counter complaint.[7] Raley's Second Amended Complaint, filed February 8, 2017, alleged, *inter alia*, that Brinkman breached the operating agreement by failing to make a capital contribution of $175,000 and that Brinkman Holdings breached the lease by failing to provide a built-to-specification operational restaurant and parking and by unilaterally increasing the rent, resulting in damages of at least $49,000. The complaint also included a claim for declaratory judgment to construe the parties' salary agreement and to award Raley damages in the amount of $519,809.64 for underpayment of his salary.

Brinkman's Third Amended Counterclaim, filed on March 10, 2017, asserted claims for breach of contract, breach of fiduciary duty, conversion, and punitive damages, alleging, *inter alia*, that Raley misappropriated 4 Points' funds and resources for Raley's personal benefit and his other businesses, and paid himself excessive distributions and salary while withholding a large portion of Brinkman's distributions and salary. Brinkman also claimed that 4 Points failed to reimburse him for The Pharmacy build-out and initial operating expenses in excess of his $175,000 capital contribution. Brinkman sought to terminate Raley's membership interest in 4 Points because he willfully and persistently breached his fiduciary duty, and because it was no longer reasonably practicable for the two men to continue operating the business together. Finally, Brinkman claimed he was entitled to attorneys' fees in accordance with Tenn. Code Ann. §§ 48-249-804 and -805, and/or the operating agreement.

## B. PARTIAL SUMMARY JUDGMENT – ATTORNEYS' FEES

Raley filed a motion to summarily dismiss Brinkman's claim for attorneys' fees under the operating agreement. Raley contended that the plain language of section 24 of

---

[5] Section 18 of the operating agreement allowed the owners to have separate businesses. Raley formed Amaranth Hospitality Group, LLC to own and operate Butchertown Hall.

[6] Raley asserted his claims as "Terrell K. Raley, individually and on behalf of 4 Points Hospitality, LLC." Raley also named Brinkman Holdings as a defendant.

[7] Brinkman asserted his counter claims as "Cees Brinkman, individually and on behalf of 4 Points Hospitality, LLC."

the agreement provided that attorneys' fees would be awarded to the prevailing party only in the event the dispute was submitted to arbitration.

In his response, Brinkman conceded that the attorneys' fees provision required the parties to submit disputes to arbitration. Brinkman argued, however, that "[b]oth the law and equity dictate that . . . Raley waived any right to contend that the attorney's fees provision does not apply to the outcome of this case" by filing suit in chancery court.

After a hearing, the trial court summarily dismissed Brinkman's contractual claim stating, in pertinent part:

> [T]he contract text must 'specifically and expressly articulate' that recovery of attorney's fees was intended under the circumstances presented by the case . . . . The rules for commercial arbitration of the American Arbitration Association, provided for in section 24, differ from court procedures. Thus, the assumptions and premise on which recovery of attorney's fees was agreed to by the parties in section 24 of the Partnership Agreement are not present in this litigation.

### C. OTHER PRETRIAL RELIEF

Pending trial, Brinkman filed a motion to appoint a custodian to protect the assets of 4 Points. In his response to the motion, Raley contended that 4 Points was a highly profitable business, and thus, it did not need a custodian to manage its finances. The trial court determined that while 4 Points did not require the harsh remedy of a custodian, there was enough evidence of mismanagement to necessitate some degree of fiscal monitoring. Accordingly, the court appointed a fiscal agent on September 15, 2016, with instructions to perform independent monitoring of 4 Points' finances; to review fiscal operations, protocols, accounting and bookkeeping, and to suggest necessary changes; and to file monthly reports with the court regarding the results of the financial monitoring.

The fiscal agent filed monthly reports with the court, which detailed the agent's findings and recommendations regarding The Pharmacy's compliance with generally accepted accounting procedures. In the meantime, Raley hired a different accountant to ensure proper oversight of The Pharmacy's finances in the future, and Raley reimbursed 4 Points a portion of non-Pharmacy-related expenses. In an order entered on January 9, 2017, the court determined that the fiscal agent "has been beneficial in providing clarity as to the finances of the business," and "many of the recommendations/protocols/procedures from

the Fiscal Agent have been or are in the process of being implemented." In an order entered on January 25, 2017, the court concluded the fiscal agent's appointment.[8]

## D. BENCH TRIAL

Beginning on May 15, 2017, a bench trial was held over the course of eight days where a number of witnesses testified, including Raley, Brinkman, and 4 Point's original accountant, Joe England. On July 17, 2017, the trial court entered a thorough, 65-page decision. Below, we summarize the rulings that are pertinent to this appeal.

### 1. Distributions, Salary, and Non-Pharmacy-Related Expenses

The court determined that, under the operating agreement, Brinkman and Raley would each receive an equal share of the company's distributions. Additionally, the oral salary agreement provided that Raley would receive a salary of up to eight percent of gross income, and Brinkman would receive a salary of four percent. The court found that the salary agreement did not include, as Brinkman contended, another four percent to be set aside in a separate account for the development of other restaurants. The court determined that, though Raley received less than eight percent of his salary over the years, Raley was not underpaid, as he claimed, because the agreement called for Raley to receive ***up to*** eight percent.

The court found in favor of Brinkman on his claims against Raley for breach of contract, breach of fiduciary duty, and conversion, ruling:

> [T]he evidence was that as the LLC managing member, with a fiduciary duty of loyalty to maintain accurate and complete records and to account for LLC transactions, and duties under the Operating Agreement, the following occurred on Plaintiff Raley's watch from 2012 until the February 2016 filing of the lawsuit:
>
> — $227,445.33 underpaid distributions to Brinkman

---

[8] A dispute arose concerning intellectual property rights owned by The Pharmacy. Upon Brinkman's motion, the court entered an order enjoining the transfer of any intellectual property rights of 4 Points to Raley or his other business and enjoining Raley from opening a second Pharmacy restaurant. Thereafter, Raley filed an amended complaint, wherein he requested that the court declare that Raley, rather than 4 Points, held rights to the intellectual property associated with The Pharmacy. However, Raley and Brinkman later entered into a "Stipulation and Joint Notice of Voluntary Dismissal of Intellectual Property Claims with Prejudice" whereby Raley agreed to a dismissal with prejudice of his claims to The Pharmacy's intellectual property. And the parties agreed to stipulate that 4 Points owned and controlled the intellectual property rights associated with The Pharmacy. Thus, The Pharmacy's intellectual property is not at issue in this appeal.

— $371,244.79 underpaid salary to Defendant Brinkman

— $315,551.86 in unexplained expenses which appear on their face to be personal expenses of Plaintiff Raley or for his other businesses.

Thus, the greater weight and preponderance of the evidence established systemic/persistent and material breaches of fiduciary duty and breach of the Operating Agreement by Plaintiff Raley . . . . These breaches also constitute conversion . . . .

2. Punitive Damages

The trial court found that Brinkman had proven by a preponderance of the evidence that Raley was "gross and willful in persistently failing to monitor and keep separate the property and funds of 4 Points from his personal funds and his other businesses." But the court found that the instant success of the business and pressure to meet demand made bookkeeping and financial consulting an afterthought for Raley. It also found that, during the course of litigation, Raley reimbursed 4 Points $75,276.27 for non-Pharmacy-related expenses, and he retained a different accountant to ensure proper oversight of The Pharmacy's finances in the future. Based on these and other findings, the court determined that the evidence was not clear and convincing that Raley acted "with malice or the intent to steal or take from Defendant Brinkman." Therefore, Raley was not liable for punitive damages.

3. Brinkman's Capital Contribution

At the trial, Brinkman testified that Raley orally waived his $175,000 capital contribution just before Brinkman signed the operating agreement. As further proof of waiver, Brinkman claimed that Raley never once asked him for the capital contribution in the five years preceding litigation and did not deduct the capital contribution from Brinkman's distributions and salary.

The trial court determined that the operating agreement was unambiguous, and the parol evidence rule did not permit the court to consider an oral agreement made prior to contracting "to alter, vary, or qualify the plain meaning" of the unambiguous operating agreement. As for Brinkman's waiver defense, the trial court ruled as follows:

Defendant Brinkman's other defense is that Plaintiff Raley waived the $175,000 capital contribution. The defense is dismissed for insufficient proof. To overcome the explicit terms of the Operating Agreement with a defense of waiver it is the burden of the proponent of the defense to show waiver by clear, unequivocal and decisive actions.

- 8 -

．  ．  ．

Applying the law of waiver to the record, the Court accredits Plaintiff Raley's testimony that it was not his intent to waive Defendant Brinkman's $175,000 capital contribution. The Court accredits the testimony of Plaintiff Raley that he confronted Defendant Brinkman about the capital contribution twice after the build out was completed, and expected and awaited payment. In the face of this credible testimony the Court finds that the facts of Plaintiff Raley, as managing member, paying distributions to Defendant Brinkman, without deducting the capital contribution, is insufficient to prove waiver.

Therefore, the court determined that Brinkman breached the operating agreement by failing to make a $175,000 capital contribution.

The court also dismissed Brinkman's claim seeking reimbursement from 4 Points for the amounts he paid to build out the restaurant. The court determined that Brinkman Holdings was obligated to cover the build-out expense as part of the lease agreement.[9]

4. Attorneys' Fees

In addition to having asserted a claim to recover his attorneys' fees based on language in the operating agreement, Brinkman claimed to be entitled to recover his attorneys' fees in accordance with Tenn. Code Ann. §§ 48-249-804(a), -804(b), and/or -805.

Tennessee Code Annotated, section 48-249-804(a) provides that on termination of a derivative proceeding, the court may award attorneys' fees to a defendant "if it finds that the proceeding was commenced without reasonable cause." The court denied Brinkman's request for attorneys' fees in accordance with this section finding, in pertinent part:

There was reasonable cause for Plaintiff Raley to file this lawsuit. There was uncertainty and confusion about the terms of the parties' agreements and the performance required . . . which needed to be determined. Further, the parties had reached an impasse in their ability to deal with each other. The parties were at an impasse in making key decisions about the business as demonstrated by the disputes referred to above which surfaced in the litigation, such as renewal of the lease, and hiring and firing of key employees, and in carrying on the business. The alternative of filing a lawsuit to obtain clarity was appropriate and reasonable.

---

[9] The court also dismissed Raley's claim that Brinkman Holdings failed to provide a build-to-specification restaurant and parking.

Tennessee Code Annotated section 48-249-804(b) affords the trial court the discretion to award attorneys' fees to the prevailing party in a derivative proceeding. The court denied Brinkman's request for attorneys' fees in accordance with this section finding, in pertinent part:

> Brinkman has not been entirely the prevailing party. He has prevailed on some claims but has been found to have breached the Operating Agreement by not making his capital contribution; he caused confusion about the amount of the lease payments The Pharmacy was to make to [Brinkman Holdings]; and he has been found to have been mistaken about the existence, as part of the salary agreement, of a 4% reserve fund for future development.

The court also denied attorneys' fees in accordance with § 48-249-805, which gives the trial court the discretion to award equitable relief in the form of attorneys' fees and expenses in the event one of the members of the LLC violates a provision in Tennessee's Revised Limited Liability Company Act (the "LLC Act"), Tenn. Code Ann. § 48-249-101 to -1133.

### 5. Termination of Raley's Membership Interest

The court terminated Raley's membership interest in accordance with Tenn. Code Ann. §§ 48-249-503(a)(6)(B) and (C), finding:

> The evidence established that the personal and business relationship of the parties has been destroyed. Because of the significant dollar amounts and property that Plaintiff Raley and /or those working under his control and supervision mixed in with his personal funds and those of [his other business], when he was performing the duty as the managing member as a fiduciary, Defendant Brinkman no longer trusts Plaintiff Raley, and the parties no longer speak to or deal with each other. . . .
>
> The impact of this lack of communication and trust is exponential in this case because Defendant Brinkman is the landlord of the premises where The Pharmacy is located. That the parties are no longer working together but are suspicious and at odds has also destroyed the landlord/tenant relationship.

Acting pursuant to Tenn. Code Ann. § 48-249-505(c), the court then ordered Brinkman to file notice stating whether 4 Points intended to continue the business without Raley,[10] which would be determinative of whether the court would need to hold a hearing

---

[10]Tennessee Code Annotated, section 48-249-505(c) provides:

to ascertain the fair value of Raley's membership interest. *See* Tenn. Code Ann. §§ 48-249-505 and -506.[11]

E. MOTION TO ALTER OR AMEND ORDER

Brinkman moved the trial court to revise its order as to Raley's liability for punitive damages and Brinkman's entitlement to attorneys' fees in accordance with Tenn. Code Ann. § 48-249-804(a) & (b) or § 48-249-805.[12]

The court denied Brinkman's motion in every respect but one. In regard to Brinkman's request for attorneys' fees, the court found:

> The part of Defendant Brinkman's motion to recover fees which does have merit is that although Brinkman obtained termination of Raley's membership interest in 4 Points, and Raley breached fiduciary duties to the LLC and Brinkman, Raley's termination is accompanied by 4 Points being required by law to pay Raley fair value for his membership interest upon his

---

> (c) Purchase at fair value. If the existence and business of the LLC are continued following the termination of a membership interest under § 48-249-503(a) . . . regardless whether such termination of membership interest was wrongful, any member whose membership interest has so terminated . . . is entitled . . . to receive from the LLC the fair value of the terminated membership interest as of the date of termination of such membership interest, calculated as set forth in § 48-249-506, in consideration for all such membership interest.

[11] Tennessee Code Annotated, section 48-249-506(3)(B) provides:

> If an LLC is required or elects to purchase a membership interest at fair value under § 48-249-505, then:
>
> (B) In a proceeding brought to determine the fair value of a membership interest in an LLC, the court:
> (i) Shall enforce any governing terms in the LLC documents as to the amount of fair value and other terms of payment as provided in subdivision (2);
> (ii) In the absence of any such governing terms in the LLC documents, shall determine the fair value of the membership interest, considering, among other relevant evidence, the going concern value of the LLC, any other agreement among any members fixing the price or specifying a formula for determining value of membership interests for any other purpose, the recommendations of an appraiser appointed by the court, if any, the recommendations of any of the appraisers of the parties to the proceeding, and any legal or financial constraints on the ability of the LLC to purchase the membership interest[.]

[12] Brinkman did not address the trial court's failure to award prejudgment or post judgment interest.

expulsion. Thus, as a 50% member of the LLC, Brinkman receives only 50% value for the LLC recovery at trial yet bears 100% of the cost of the recovery.

Therefore, in accordance with Tenn. Code Ann. § 48-249-805, the court granted equitable relief to Brinkman by revising its order to allow half of the $240,275.59[13] that Raley owed 4 Points as reimbursement for non-Pharmacy-related expenses to be paid to Brinkman, individually.

F. VALUATION OF RALEY'S MEMBERSHIP INTEREST

Because Brinkman filed notice that 4 Points would continue the business and buy out Raley's membership interest pursuant to Tenn. Code Ann. § 48-249-505 and -506, it was necessary to have an evidentiary hearing to determine the fair value of Raley's 50% membership interest in 4 Points.

Prior to the hearing, Raley filed a motion to determine the meaning and components of fair value under Tenn. Code Ann. § 48-249-506(3). Raley filed his motion in response to the valuation report prepared by Brinkman's expert, wherein the expert discounted Raley's membership interest for lack of marketability and lack of control and applied a corporate income tax rate to 4 Points' income.

Raley argued that a shareholder-level discount for lack of marketability and lack of control should not apply when the court's task is to determine the **fair value**, rather than the **fair market value**, of the membership interest. He contended that, because the company, rather than a third-party, was purchasing the membership interest, the fact that the interest was non-controlling and had no ready market was irrelevant. Raley also contended that the application of a corporate income tax rate to 4 Points' income stream, a valuation consideration known as "tax-affecting," was inappropriate "as a matter of law" because 4 Points does not pay a corporate income tax. Raley based his contention in large part on the U.S. Tax Court's reasoning in *Gross v. Comm'r IRS*, 272 F.3d 333, 335 (6th Cir. 2001).[14]

Conversely, Brinkman argued that lack of marketability, lack of control, and tax-affecting were relevant in determining the fair value of 4 Points. Specifically, Brinkman argued that the shareholder-level discounts were necessary to punish and deter Raley's wrongful conduct. In arguing that tax-affecting constituted relevant evidence of the fair

---

[13] The court determined that Raley was liable to 4 Points for $315,551.86 in personal expenses. However, pre-trial, Raley reimbursed 4 Points $75,276.27, which the trial court credited to Raley when calculating the final total of $240,275.59 in personal expenses.

[14] In *Gross*, the court's task was to determine "the fair market value" of stock in an S corporation for gift tax purposes. *See Gross*, 272 F.3d at 335. The court determined that the application of a zero percent tax rate to the subject corporation's income best reflected the tax benefits of an S corporation. *Id*. at 346.

value of Raley's membership interest, Brinkman submitted the affidavit of Thomas M. Price, an accountant and valuation expert. Mr. Price testified, *inter alia*, that the application of a 38% tax rate "was entirely appropriate and comports with generally accepted valuation standards and methods." Mr. Price explained in considerable detail the reasoning behind the application of a 38% tax rate to 4 Points' income stream under the income approach to valuation. Among other things, he stated that because "all of the components of the Capitalization Rate are based on after-tax values or after-tax income data, the income stream to which the Capitalization Rate is applied in the Income Approach must also be an after-tax amount in order to be comparing apples to apples."[15] Mr. Price further stated:

> If taxes were not factored into the income stream, the value of the stream would be greater. But, correspondingly, if taxes were not factored into the various components of the Capitalization Rate, the Capitalization Rate would be higher and, thus, its discounting effect would be greater. While that would also be an apples-to-apples comparison, it is not permissible to inflate the income stream by disregarding taxes but depress the Capitalization Rate by considering taxes, which is the result Raley is arguing for in this case.

After considering the arguments of the parties and the affidavit of Brinkman's expert[16], the court decided to exclude any testimony or evidence pertaining to discounts for marketability and lack of control. It also determined that the application of a corporate income tax rate to 4 Points' income stream would not be appropriate in determining the fair value of Raley's membership as a matter of law.

First, the court reasoned that "fair value" was a more flexible term than "fair market value," and thus, the term "fair value" as that term is used in Tenn. Code Ann. § 48-249-506 did not necessarily "preclude the application of discounts for lack of marketability or control." However, the court reasoned that, under the undisputed facts of this case, discounts for lack of control and marketability were inapplicable.

In making its determination that a discount for lack of control was not appropriate, the court relied on other jurisdictions holding that when a shareholder who is already in control of a corporation elects to purchase the shares of the dissenting shareholder, the fact that those shares are non-controlling is irrelevant. Thus, the court determined that because Brinkman will be the controlling member of 4 Points after the buy-out, the value of Raley's interest should not be reduced for lack of control.

---

[15] Generally, "capitalization rate" is "[t]he interest rate used in calculating the present value of future periodic payments." Interest Rate, *Black's Law Dictionary* (11th ed. 2014).

[16] Raley retained an expert witness, Stephen Maggart, but Mr. Maggart did not submit an affidavit in support of Raley's motion.

The court also declined to apply a reduction for lack of marketability. The court contended that, in most jurisdictions, "reductions for lack of marketability are not . . . applied in LLC membership valuation," unless extraordinary circumstances exist. This is due, in part, because the market is irrelevant in such cases. Furthermore, the court declined to apply a shareholder-level discount to punish and deter Raley's wrongful behavior, because Tenn. Code Ann. § 48-249-505 provides that the member whose membership interest is terminated is entitled to receive the fair value of his membership interest "regardless whether such termination of membership interest was wrongful."

As for the corporate tax adjustment, the court ruled:

> The Court adopts the authorities cited by Plaintiff Raley and reasoning that "no entity level tax should be applied in the valuation analysis for a non-controlling interest in an electing S corporation, absent a compelling demonstration that independent third parties dealing at arms-length would do so as part of a purchase price negotiation." [Citation omitted[17]]. In so concluding, the Court rests primarily on the reasoning that the LLC elected to be taxed as an S-corporation. As a nontaxable pass-through, the LLC does not pay federal income taxes on their entity level earnings; the taxes are paid by the individual owners on their own returns. Thus, even for the purpose of establishing a correlation, as asserted by Defendant Brinkman's expert, the Court nevertheless concludes as a matter of law this would not be appropriate. The Court also, to a lesser extent, is guided by *Gross v. Comm'r IRS*, 272 F.3d 333, 347 (6th Cir. 2001) although, as pointed out by Defendant Brinkman, the context of *Gross* is the fair market value of gifted stock for federal income tax purposes, and it is not on point but only analogous.

---

[17] In reaching its decision, the court relied on a job aid for IRS valuation analysts submitted by Raley entitled, *Valuation of Non-Controlling Interests in Business Entities Electing to be Treated as S Corporations for Federal Tax Purposes*, prepared by representatives of the Large Business and International Division NRC Industry, Engineering Program and the Small Business/Self-Employed Division Estate and Gift Tax Program, dated October 29, 2014. In the final summary, it states:

> With respect to the question of pass-through taxation, no entity level tax should be applied in the valuation analysis of a non-controlling interest in an electing S corporation, absent a compelling demonstration that independent third parties dealing at arms-length would do so as part of a purchase price negotiation. In a similar manner, the personal income taxes of a potential interest buyer or interest seller are not relevant in determining fair market value of an interest in an electing S corporation.

We note that on the bottom of each page of the job aid, it states: "This job aid is not Official IRS position and was prepared for reference purposes only; ***it may not be used or cited as authority for setting any legal position.***" (Emphasis added).

Having ruled on the issues presented by Raley's pretrial motion, the court held an evidentiary hearing on August 13 and 14, 2018, to determine the value of Raley's membership interest. A number of witnesses testified at the valuation hearing, including Brinkman's expert, Thomas M. Price, and Raley's expert, Stephen M. Maggart, both of whom are certified public accountants, certified valuation analysts, certified in financial forensics, and accredited in business valuation. After considering the testimony of both Raley's and Brinkman's experts as well as other witnesses, the court determined that the fair value of Raley's 50% membership interest was $2,387,139.09.

It first determined that "the weighted average net income of 4 Points—pretax for value purposes—is $930,525." The court then calculated the capitalization rate using the build-up method, based on values published by Duff & Phelps, and arrived at a capitalization rate of 18.63%. The court concluded:

> The result, then, of the Court's 18.63% cap rate for $930,525 average net income weighted at 95% is $4,745,028.18. Added to that is $29,250.00 (5% for $402,000 Book Value Method and $183,000 Adjusted Asset Method). Thus, the total fair value of a 100% interest in 4 Points at July 17, 2017 was $4,774,278.18. A 50% fair value interest, i.e. the value of Plaintiff Raley's membership as of July 17, 2017, was $2,387,139.09.

Upon Brinkman's motion, the court amended its order on October 9, 2018, and allowed Brinkman to offset the amount of Raley's interest by $290,279.10 based on the previous damage award against Raley. The court also ordered 4 Points to make an initial installment payment of $500,000 by November 6, 2018. And when Raley received the first installment, the court required him to "deliver an instrument of transfer of his membership interest to the LLC pursuant to Tennessee Code Annotated section 48-249-506(3)(B)(iv)."

This appeal followed. But before Brinkman filed his brief, Raley filed a motion to dismiss the appeal.

## II. MOTION TO DISMISS APPEAL

Shortly after the notice of appeal was filed, Raley filed a motion with this court to dismiss the appeal on the ground of waiver. He contends Brinkman waived his right to appeal by paying the first installment of $500,000 and accepting the transfer of Raley's membership interest. Stated another way, Raley contends Brinkman is estopped from challenging the unfavorable aspects of the trial court's judgment because Brinkman "accepted and took advantage of substantial benefits" of the trial court's July 2017 order terminating Raley's membership interest and the court's valuation order determining the value of Raley's interest.

Brinkman argues that he did not waive his right to appeal and moves this court to consider post-judgment facts, specifically, an email from Brinkman's attorney, Scott Sims, sent to Raley's attorneys, Seth McInteer and Howell O'Rear, on November 1, 2018, and the accompanying affidavit of Scott Sims. In the email, Mr. Sims acknowledges that Brinkman made a wire transfer of $500,000 on that day. He also states that the payment "should not be construed as a waiver of any of Brinkman's issues with respect to the trial court's valuation of Raley's membership interest or any of the other proceedings in the trial court."[18] Neither party disputes the authenticity of the email, but Raley argues that we should not consider it because, when read in its entirety, it is capable of more than one interpretation.

Rule 14 of the Tennessee Rules of Appellate Procedure states:

> **(a) Power to Consider Post-Judgment Facts.** The Supreme Court, Court of Appeals, or Court of Criminal Appeals on its motion or on motion of a party may consider facts concerning the action that occurred after judgment. Consideration of such facts lies in the discretion of the appellate court. While neither controlling nor fully measuring the court's discretion, consideration generally will extend only to those facts, capable of ready demonstration, affecting the positions of the parties or the subject matter of the action such as mootness, bankruptcy, divorce, death, other judgments or proceedings, relief from the judgment requested or granted in the trial court, and other similar matters. . . .

We have determined that the email submitted by Brinkman is "capable of ready demonstration" and affects the positions of the parties; therefore, we will consider it in determining whether to dismiss the appeal. *See id*.

On this issue we find the Tennessee Supreme Court's decision in *Catlett v. Indemnity Insurance Company of North America*, 914 S.W.2d 76 (Tenn. 1995) is instructive. In *Catlett*, the trial court awarded the plaintiff over $140,000 in damages. *Id*. The defendant appealed. While the appeal was pending, the defendant paid the plaintiff $77,988.77 in satisfaction of certain aspects of the judgment. *Id*. The defendant included a letter with the payment which stated that the payment was in compliance with the trial

---

[18] The email reads, in its entirety, as follows:

I am informed that Brinkman made the $500,000 wire transfer today. As such, we will expect to receive the signed transfer instrument on Monday and all money be held in trust until we have that document. Please confirm receipt of the wire.

The payment was made to comply with the court's order. It should not be construed as a waiver of any of Brinkman's issues with respect to the trial court's valuation of Raley's membership interest or any of the other proceedings in the trial court.

court's order and was made pending the outcome of the appeal. *Id*. The plaintiff filed a motion to dismiss the appeal on the grounds the judgment had been satisfied. *Id*. The Tennessee Supreme Court denied the motion, heard the appeal, and reversed the trial court's decision. *Id*. at 77.

On remand, the defendant filed a motion to compel the plaintiff to repay the funds. The trial court denied the motion, and the defendant, again, appealed. *Id*. The plaintiff argued that the payment was a "voluntary and unconditional satisfaction of the trial court's judgment which she should be entitled to keep." *Id*. However, the Court found in favor of the defendant:

> The transmittal letter accompanying the payment made it clear that the money was being paid "pending the outcome of . . . appeal," that the employer intended to pursue its rights on appeal, and that counsel was presently preparing the appeal. The [defendant] contested plaintiff's motion to dismiss the appeal and also questioned the underlying legal basis for plaintiff's recovery.

> Under these circumstances, we hold that the employer is entitled to recover the funds paid to plaintiff. Our conclusion is consistent with the general rule:

>> A party who voluntarily acquiesces in, ratifies, or recognizes the validity of, a judgment, order, or decree against that [party], or otherwise takes a position which is inconsistent with the right to appeal therefrom, thereby impliedly waives, or is estopped to assert, [the] right to have such judgment, order, or decree reviewed by an appellate court[.]

>> .    .    .

>> In order to be a bar of the right of appeal on the ground of acquiescence, the acts relied on as a waiver . . . must be such as to ***clearly and unmistakably show*** an inconsistent course of conduct or an unconditional, voluntary, and absolute acquiescence, with the intent to ratify or confirm the judgment, and to acquiesce and abandon the right of appeal.

*Id*. at 78 (emphasis added).

Thus, to dismiss the appeal based on waiver, Brinkman's act of paying the first installment of $500,000 and accepting the transfer of Raley's membership interest must "clearly and unmistakably show . . . the intent to ratify or confirm the judgment, and to acquiesce and abandon the right to appeal." *See id*. Considering that the email plainly states

- 17 -

that Brinkman's payment should not be construed as a waiver, Raley has failed to clearly and unmistakably show that Brinkman intended to ratify the judgment and abandon the right to appeal. Accordingly, we deny Raley's motion to dismiss the appeal.

## III. ISSUES

In this appeal, Brinkman contends that the trial court erred in determining that (1) Brinkman breached the operating agreement by failing to make a capital contribution, (2) Raley was not liable for punitive damages, (3) discounts for lack of control and lack of marketability were inapplicable to the valuation of Raley's membership interest, (4) tax-affecting did not constitute relevant evidence of the fair value of Raley's membership interest, and (5) Brinkman was not entitled to attorneys' fees pursuant to the operating agreement and/or §§ 48-249-804 and -805. Brinkman also argues that the trial court erred in failing to award prejudgment and post-judgment interest. Additionally, both parties argue that they are entitled to attorneys' fees on appeal.

## IV. ANALYSIS

### A. BRINKMAN'S BREACH OF THE OPERATING AGREEMENT

Brinkman contends the trial court erred in ruling that he breached the operating agreement by failing to make the alleged $175,000 capital contribution. Brinkman insists that Raley orally waived his capital contribution just before they signed the operating agreement. Brinkman also contends that Raley's acts and omissions after they executed the operating agreement constitute a waiver of Brinkman's obligation to contribute $175,000.

"In all actions tried upon the facts without a jury, the court shall find the facts specially and shall state separately its conclusions of law and direct the entry of the appropriate judgment." Tenn. R. Civ. P. 52.01. If the trial court makes the required findings of fact, appellate courts review the trial court's factual findings de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (citing Tenn. R. App. P. 13(d)). "For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect." *State ex rel. Flowers v. Tennessee Trucking Ass'n Self Ins. Grp. Trust*, 209 S.W.3d 595, 599 (Tenn. Ct. App. 2006). Our review of a trial court's determinations on issues of law is de novo, without any presumption of correctness. *Lind v. Beaman Dodge, Inc.*, 356 S.W.3d 889, 895 (Tenn. 2011).

#### 1. Parol Evidence Rule

Brinkman contends the trial court erred by determining that the parol evidence rule did not permit the court to consider an oral agreement made before contracting "to alter,

vary, or qualify the plain meaning" of the written contract. More specifically, Brinkman contends the trial court erred in determining that the parol evidence rule applied because parol evidence is admissible to establish a waiver of a contractual provision. In response, Raley argues that Brinkman is not offering parol evidence to support the affirmative defense of waiver; rather, he is impermissibly offering it to alter an unambiguous term of the operating agreement.

Generally, the parol evidence rule provides that an oral agreement made prior to or contemporaneous with the execution of a written contract cannot add to, vary, or contradict the unambiguous terms of the contract. *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tennessee, Inc.*, 566 S.W.3d 671, 694–95 (Tenn. 2019). In Tennessee, courts "give primacy to the contract terms, because the words are the most reliable indicator— and the best evidence—of the parties' agreement when relations were harmonious, and where the parties were not jockeying for advantage in a contract dispute." *Id.* at 694 (quoting Feldman, 21 Tenn. Practice § 8:14). The foregoing notwithstanding, the Tennessee Supreme Court commented in *Individual Healthcare Specialists* that the parol evidence rule is unfortunately named in several respects. *Id.* at 695.

> First, it encompasses more than simply parol (i.e., oral) evidence of pre-contract negotiations. Second, even though it is sometimes expressed as a rule of evidence relating to the "admissibility" of parol evidence, the parol evidence rule is more accurately characterized as a rule of substantive law. This means that even evidence of pre-contract negotiations that is admitted without objection is "incompetent and ineffective" to alter the terms of a written agreement.

*Id.* at 695–96 (citations omitted). The court concluded its discussion of the parol evidence rule stating, "The question is not really whether evidence can be admitted which might vary the written document, but whether, if the evidence is admitted, it will have the legal effect of varying the document." *Id.* at 696. (citing P.S. Atiya, *An Introduction to the Law of Contract* 161-62 (3d ed. 1981) (quoted at Black's Law Dictionary 1292 (10th ed. 2014)).

Significantly, "the parol evidence rule is most restrictive when the contract at issue is fully or completely integrated—that is, when it is intended to be the complete and exclusive statement of the parties' agreement." *Id*. In such cases, "the parol evidence rule does more than prohibit the use of pre-contract negotiations to contradict the contract's terms; it also prohibits the use of pre-contract negotiations . . . in a way that would *supplement or limit* its terms, even if that evidence is consistent with the written terms of the contract." *Id*. (emphasis in original).

We begin our analysis by noting that the 4 Points operating agreement is fully integrated and states as follows:

**31. ENTIRE AGREEMENT**

This instrument contains the entire Agreement of the Partners relating to the rights granted and obligations assumed in this Agreement. Any oral representations or modifications concerning this instrument shall be of no force and effect unless contained in a subsequent written modification signed by the Partners hereto.

As the trial court correctly determined, the operating agreement unambiguously provides that Brinkman is to make a $175,000 capital contribution in cash:

**4. INITIAL CAPITAL CONTRIBUTIONS**

The Partners shall make the following initial contributions (the "Initial Capital Contributions") to the Partnership. Any actual money spent before the Effective Date by any of the Partners shall be reimbursed from the Partnership's capital as soon as possible after processing by the Partnership's accounting staff.

| Name of Partner | Contribution Type | Value |
|---|---|---|
| Terrell Kristen Raley | Labor | $30,000 |
| Cees Brinkman | Cash | $175,000 |

At the trial, Brinkman testified that just before he signed the agreement, he and Raley discussed his capital contribution, and Raley told Brinkman that he would not require Brinkman to pay it. Specifically, Brinkman testified:

I did not study the entire operating agreement, but I opened it up and I saw— it said that Terrell had 30,000 in labor and almost 175,000 that I had to put in. I was like, "I put in way more than 175,000 and I also put a lot of labor in." He's like, "Yeah, yeah. Don't worry about 175-. I know you put in way more than that." So that was the end of it and we never talked about the 175,000 ever again until the litigation started—until I got the lawsuit on me.

The 4 Points Operating Agreement was fully integrated and, as the trial court correctly determined, unambiguously provided that Brinkman was to contribute $175,000 in cash. Thus, the evidence Brinkman proffered to establish an oral agreement made prior to contracting cannot alter, contradict, or for that matter, supplement or limit the terms of the written operating agreement. While Brinkman's testimony regarding the oral agreement was admitted at the trial, it is "incompetent and ineffective" evidence. *Id*. at 696 ("[E]ven evidence of pre-contract negotiations that is admitted without objection is

"incompetent and ineffective" to alter the terms of a written agreement.) Therefore, we affirm the trial court's ruling.

2. Waiver

Brinkman also contends that Raley's actions or omissions ***after*** executing the operating agreement constitute waiver of Brinkman's contractual obligation to make a capital contribution of $175,000. Specifically, he argues that Raley waived Brinkman's capital contribution by continuing to pay Brinkman's distributions and salary for the five years preceding the litigation without deducting Brinkman's capital contribution. We disagree.

This court's decision in *GuestHouse International, LLC v. Shoney's North America Corporation,* 330 S.W.3d 166, 201 (Tenn. Ct. App. 2010) is instructive. *GuestHouse* concerned a contract dispute between a restaurant chain and a motel chain. *Id*. at 171. Shoney's restaurants had a licensing agreement with ShoLodge that allowed ShoLodge to use Shoney's service marks. *Id*. When Shoney's restaurants encountered significant financial difficulties years later, ShoLodge decided that the use of the Shoney's name was more of a burden than a benefit. *Id*. at 172–73. In a letter to its shareholders, the ShoLodge CEO wrote of "the plan to convert all of the Shoney's brand properties to the GuestHouse brand and [the] intention to franchise only the GuestHouse name in the future." *Id*. at 173. ShoLodge also communicated those intentions directly to Shoney's, and over the next several years, ShoLodge systematically rebranded its motels. *Id*.

In the interim, another entity bought Shoney's assets, intending to breathe new life into the Shoney's brand. *Id*. at 175. This prompted ShoLodge (which had been bought out by Settle Inn) to re-launch the Shoney's Inn motels in accordance with the licensing agreement that was still in effect. When ShoLodge informed Shoney's of its intentions, Shoney's notified the motel chain that it was rescinding and terminating the licensing agreement. *Id*. at 176. Thereafter, ShoLodge commenced an action against Shoney's restaurants, and in response, Shoney's asserted, as an affirmative defense, that ShoLodge waived its rights under the licensing agreements. *Id*. at 201. We discussed the scope and application of the doctrine of waiver as follows:

A waiver ... is generally defined as a voluntary and intentional relinquishment of a known right.... [T]here are few, if any, more erroneous definitions known to the law. For one thing, waiver is far more multifaceted than this definition would allow for. Moreover, even as far as it goes, it is totally misleading. It strongly implies that the waiving party intends to give up a right. In reality, many, if not most waivers are unintentional and frequently do not involve a "right" that the party is aware of. **Finally, contractual *rights* are not waivable, *conditions* are**. In general, the doctrine of waiver is "an excuse for nonperformance of contractual duties or

- 21 -

conditions ... based in large part on the policies against forfeiture and unjust enrichment." It is "designed to prevent the waiving party from lulling another into a belief that strict compliance with a contractual duty will not be required, and then either suing for noncompliance or demanding compliance for the purpose of avoiding the transaction." For this reason, the doctrine of waiver **"applies primarily to conditions which may be thought of as procedural or technical, or to instances in which the non-occurrence of a condition is comparatively minor."**

*Id.* (citations omitted) (footnotes omitted) (emphasis added).

In *GuestHouse,* we identified the Tennessee Supreme Court's decision in *Chattem, Inc. v. Provident Life & Accident Insurance Company*, 676 S.W.2d 953 (Tenn. 1984) as an example of an appropriate application of the waiver defense. In *Chattem*, the insurance contract provided that the insurance company would pay a disability insurance claim if the employee filed proof of disability within one year of the employee's termination. *GuestHouse*, 330 S.W.3d at 202. The employee filed proof of disability more than a year following termination, and the insurance company denied the claim. *Id*. The Tennessee Supreme Court held that the insurance company waived its right to enforce this condition in the contract because the insurance company previously waived the condition in seven out of 11 claims filed by the employee. *Id*. at 203. Therefore, the insurance company was obligated to pay the claim. *Id*.

Considering *Chattem* and other relevant authorities, we reasoned that "Shoney's does not assert waiver as to a comparatively minor procedural or technical condition, but rather, as to 'a material part of the agreed exchange,' indeed, the very object of the license agreements at issue." *Id*. at 203.Therefore, the court held that waiver was not applicable. *Id*.

As discussed, the operating agreement required Brinkman to contribute $175,000 in cash as his capital contribution. As such, Brinkman's obligation to make a capital contribution was "a material part of the agreed exchange;" consequently, it could not be waived by any act or omission of Raley. *See id*. at 202 ("[A] waiver of a material part of the agreed exchange is ineffective.")

Even if the affirmative defense of waiver did apply, the trial court correctly determined that Brinkman's proof was insufficient. "[W]aiver is proven by a clear, unequivocal and decisive act of the party." *Id*. The fact that Raley failed to deduct the $175,000 capital contribution from Brinkman's salary or distributions does not constitute a clear and unequivocal act establishing waiver. Moreover, the trial court credited Raley's testimony that he asked Brinkman twice for his capital contribution to no avail. "[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary." *Wells v. Tennessee Bd. of Regents,*

9 S.W.3d 779, 783 (Tenn. 1999). And we find no clear and convincing evidence to the contrary.

Therefore, we affirm the trial court's determination that Brinkman breached the operating agreement by failing to make a $175,000 capital contribution.

## B. CLAIM FOR PUNITIVE DAMAGES

Brinkman contends that the trial court's denial of punitive damages wholly contradicted its finding that Brinkman proved that Raley underpaid Brinkman's salary and distributions, and that Raley willfully and persistently used The Pharmacy's income to pay his personal expenses and the expenses of his other business. For his part, Raley asserts that liability for punitive damages requires clear and convincing evidence of intentional, fraudulent, malicious, or reckless conduct, and the record contains no such evidence.

Unlike compensatory damages, which seek to make the plaintiff whole, punitive damages are intended to punish the defendant and to deter him from committing similar acts in the future. *Goff v. Elmo Greer & Sons Const. Co.*, 297 S.W.3d 175, 187 (Tenn. 2009). "Punitive damages are thus appropriate only in the most egregious cases and, consequently, a verdict imposing such damages must be supported by clear and convincing evidence that the defendant acted intentionally, fraudulently, maliciously, or recklessly." *Id*. Clear and convincing evidence "leaves 'no serious or substantial doubt about the correctness of the conclusions drawn.'" *Id*. (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n. 3 (Tenn. 1992)).

Whether the record contains clear and convincing evidence establishing liability for punitive damages is a question of law, which we review de novo with no presumption of correctness accorded to the trial court's decision. *White v. Empire Exp., Inc.*, 395 S.W.3d 696, 721 (Tenn. Ct. App. 2012). Under the clear and convincing standard,

> the appellate court must "distinguish between the specific facts found by the trial court and the combined weight of those facts." The facts as found by the trial court are reviewed *de novo* on the record, presuming those findings to be correct unless the evidence preponderates otherwise. Findings of fact based on witness credibility are given great deference and will not be disturbed absent clear evidence to the contrary. Whether the combined weight of the facts, either as found by the trial court or supported by a preponderance of the evidence, establish clearly and convincingly that [punitive damages are warranted] is a question of law, subject to *de novo* review with no presumption of correctness.

*Id*. (quoting *In re Samaria S.*, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011)).

Brinkman's claim for punitive damages is based on two distinct categories of wrongful acts and omissions by Raley, all of which the trial court found Brinkman had proven by a preponderance of the evidence: (1) Raley underpaid Brinkman's salary and distributions; and (2) Raley willfully and persistently used The Pharmacy's income to pay his personal expenses and the expenses of his other business. We will consider the evidence pertinent to each category separately to determine whether Brinkman proved by "clear and convincing evidence that [Raley] acted intentionally, fraudulently, maliciously, or recklessly" and whether his conduct was "egregious." *See Goff*, 297 S.W.3d at 187.

1. Underpayment of Salary and Distributions

It is undisputed that Brinkman did not receive the salary and distributions to which he was entitled as required by the operating and salary agreements. Nevertheless, Raley testified that, initially, he did not understand the difference between salary and distributions, and it was his understanding that Brinkman would receive half of the distribution that Raley received, *i.e.*, an eight percent/four percent division. It was not until 2014 that Joe England, 4 Points' accountant, informed Raley that, under S corporation rules, distributions had to be made in accordance with membership interests. In the case of 4 Points, this meant a 50/50 division. According to Raley's testimony, Mr. England explained to him how to manipulate the numbers in order to honor the agreement to an eight percent/four percent division and still comply with S corporation rules. Raley testified as follows:

A. The advice that [Mr. England] gave me was to be able to maintain the 8/4 split and satisfy S-corp tax rules.

Q. What did he – What advice did he give you?

A. Essentially by taking the same 8 percent in earned income to me and 4 percent in earned income to Mr. Brinkman, the 8/4 split. However, his advice was for me to take 4 percent less salary so that my income is split between salary and distributions. And that Mr. Brinkman's distributions that would match mine at 4 percent, that would take care of the even distributions that the S-corp requirements dictate. Therefore, my salary is 4 percent and Mr. Brinkman's is zero, which explains why he didn't get salary in the years in which he discusses in his complaint.

.    .    .

Essentially [Mr. England] was saying to me to maintain—he was going off an 8/4 split. So if I took 4 percent in salary and 4 percent in distribution, that would be my 8 percent. And then Mr. Brinkman, because his distributions had to match mine, would also be 4 percent, so he would be at zero in salary.

- 24 -

So it would be 8/4. However, I misinterpreted that sometimes, because if you add zero, if you look at the formula the way he had recommended, it was 8/4, which means 2/1. So sometimes say if there was more money in the operating account, I would do 8 and then zero and then 8 and 8.

Likewise, Mr. England testified, "It was my understanding . . . [Mr. Raley] and Mr. Brinkman had an agreement whereby Mr. Brinkman got 50 percent of the distribution that [Mr. Raley] got. [Mr. Brinkman] got half the distribution that Mr. Raley received." Mr. England further testified:

So, you know, I didn't want to do any—I didn't want to do a tax return like 2013, again. Okay. So he said that –Mr. Raley said that he and Mr. Brinkman wanted to continue the 8 percent/4 percent arrangement and how could they structure it to accomplish that and still make the distributions even. So I said, simply make the distributions equal, make your additional amount to get you to the twice as much as Mr. Brinkman, take it out as salary.

The testimony and evidence also indicates that Brinkman was equally confused about the difference between salary and distributions. In an email from Brinkman to Mr. England, Brinkman indicated that he should receive half of the distribution that Raley received. Brinkman wrote, "It should be half the amount that Terrell pulled out. I went for half or 4 percent to save up in the business account for our next business venture." Brinkman testified as follows:

A.      I received, about every other, week a check and I assumed that it was the same—or that Terrell's check was double the amount. So I assumed that we were both pulling out the same checks and his was based on 8 percent and mine was based on the 4 percent. So all of those checks that came to me, I thought it was okay. It was good.[19]

Q. All right. And there were times where you would receive checks through [payroll]?

A. Once in a while.

Q. And there were times where you would receive just written checks to you; correct?

A. The checks for [payroll] were deposited into my bank account, so I didn't get checks.

---

[19] According to the testimony at the trial, distributions were made by written checks, and salary was directly deposited into the parties' accounts through payroll.

Q. Right. I understand. But in all of these years you were receiving substantial amounts of money on a regular basis; correct?

A. Correct.

Q. And did you understand the difference between a salary and a distribution at that time?

A. No.

In addition to the above, Peter Reicciardi, an accountant who reviewed The Pharmacy's finances, testified that Raley never paid himself the full eight percent of his salary in any given year although there was more than enough revenue to do so. Therefore, while Raley underpaid Brinkman's salary, he did not overpay himself.

Considering all of the evidence relevant to this claim, we agree with the trial court's finding that the evidence fails to clearly and convincingly establish that in withholding salary and distributions from Brinkman, Raley intended to steal from Brinkman. The foregoing evidence indicates that Raley—and Brinkman for that matter—misunderstood the terms of their agreement, and that Raley was attempting to comply with the agreement, as he understood it, while also complying with S corporation rules. Furthermore, we do not find Raley's actions to be egregious.

2. Payment of Raley's Personal Expenses and Expenses of Other Businesses

Brinkman contends the trial court's finding that Raley was "gross and willful in persistently failing to monitor and keep separate the property and funds of 4 Points from his personal funds and his other businesses" justifies an award of punitive damages.

Raley acknowledged that The Pharmacy's assets were improperly used to pay some expenses of Raley's other businesses, such as a sign for Butchertown Hall. But Raley explained that The Pharmacy's bookkeeping was somewhat complicated by the fact that Holland House, Butchertown Hall, and The Pharmacy shared employees, used similar inventory and equipment, and the managers of the restaurants were insured under an umbrella policy.[20] For example, Raley testified that he emailed the invoice for Butchertown

---

[20] According to Raley's testimony, the managers of all three restaurants were placed on the same health insurance plan. Raley's testimony on the health insurance issue provides a good example of the difficulties Raley faced with the bookkeeping for all three restaurants. This is because there were instances when Pharmacy was mistakenly billed for the entire insurance premium and the charges had to be parsed out. Raley testified:

Hall's sign installation to Ben Albert, who was being groomed as the regional manager for all three restaurants. The email entered into evidence merely states: "Please mail a check to Joey from the operating account today." Raley sent the email from his Pharmacy email address, and Albert mistakenly paid for the sign out of The Pharmacy's account. But there was no evidence that Raley explicitly asked Albert to pay for the sign out of The Pharmacy's account.

Raley also acknowledged that he improperly used the debit card occasionally but stated that he intended to reimburse The Pharmacy. For example, he testified to using the 4 Points debit card to purchase products from Electronic Express:

> ….And for some reason that day—and I remember that particular store. It was just a lot of chaos, and I waited a good hour just to get to the line. And my card was not working. I would assume because my card wasn't authorized at the time for that big of a balance to be charged. So instead of having to go through the trouble of calling the bank, I just used the 4 Points card **with the intent of reimbursing it immediately**, which I did.

(Emphasis added). The testimony further shows that Raley reimbursed the company but only after Mr. England brought the improper charge to Raley's attention.

To explain and mitigate some of his bookkeeping mistakes, Raley testified that he thought that Mr. England was closely monitoring the accounts, and thus, he believed that Mr. England would bring any improper charges to his attention:

> A.    I was under the assumption that [Mr. England] could pull that information off of the bank statements.

> Q. Well, if any of the other individuals who had a debit card at The Pharmacy and made charges on that debit card, would he have been provided that information?

> A. That wasn't really—as we've stated before, this was a very excessively casual company. So I guess we assumed that he was getting a lot of that information. And as it turns out, he wasn't.

---

. . . I know that according to my records that that particular circumstance occurred for a total of three periods in which we were billed, three billing periods. In those three billing periods, it was—it was some confusion. The general manager and myself, Mandi Allen, had to basically chop out each individual for each particular restaurant. And then we would figure out what that was, and Pharmacy paid the bill. We would reimburse for each restaurant subsequently. Once that was cleared up, we started getting billed separately, but that was only for three billing cycles.

- 27 -

Raley also explained that he attempted to rectify his bookkeeping mistakes prior to trial by reimbursing 4 Points a portion of the non-Pharmacy-related expenses and by hiring a different accountant to provide more oversight of The Pharmacy's accounts in the future. The evidence shows that, in its first five years in business, The Pharmacy realized approximately $14 million in gross income, with a little over $300,000 of that amount going to Raley's non-Pharmacy-related expenses. Thus, the improper expenditures represented a small fraction of the funds that were under Raley's control.

The trial court determined that Brinkman proved by a preponderance of the evidence that Raley breached his fiduciary duty by underpaying Brinkman's salary and distributions and that Raley was "gross and willful in persistently failing to monitor and keep separate the property and funds of 4 Points from his personal funds and his other businesses." The court further determined that these breaches of his fiduciary duty also constituted conversion. And we agree with these determinations. However, to recover punitive damages, Brinkman had to prove by "***clear and convincing evidence*** that [Raley] acted intentionally, fraudulently, maliciously, or recklessly" and that his conduct was "egregious." *Goff*, 297 S.W.3d at 187 (emphasis added). The trial court determined that the evidence did not clearly and convincingly establish the essential elements required to support a claim for punitive damages. We agree with this determination as well.

Therefore, we affirm the trial court's ruling on punitive damages.

C. The Proceeding to Determine "Fair Value"

Brinkman contends the trial court erred when it ruled that the application of discounts for marketability and lack of control were inappropriate under the facts of this case. Brinkman also contends the trial court erred when it determined, that the application of a corporate tax rate to 4 Points' income stream ("tax-affecting") was inappropriate as a matter of law.

A trial court's decision to admit or exclude evidence is within the trial court's discretion, and we review decisions regarding the admissibility of evidence under an abuse of discretion standard. *White v. Vanderbilt Univ.,* 21 S.W.3d 215, 222 (Tenn. Ct. App. 1999) (citing *Seffernick v. Saint Thomas Hosp.,* 969 S.W.2d 391, 393 (Tenn. 1998); *Otis v. Cambridge Mut. Fire Ins. Co.,* 850 S.W.2d 439, 442 (Tenn.1992)).

> [We] review a [trial] court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the [trial] court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the [trial] court's decision was within the range of acceptable alternative dispositions. When called upon to review a [trial] court's discretionary decision, the reviewing court should review the underlying factual findings

using the preponderance of the evidence standard contained in Tenn. R. App. P. 13(d) and should review the [trial] court's legal determinations de novo without any presumption of correctness.

*Lee Med. Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010) (internal citations omitted).

### 1. "Fair Value" Under the LLC Act

Before we address the arguments concerning the applicability of discounts for marketability and lack of control and whether "tax-affecting" is relevant evidence in determining the fair value of Raley's membership interest, we find it necessary to address the meaning of the term "fair value" as it applies to this case.

Tennessee Code Annotated, section 48-249-505 provides:

> (c) **Purchase at fair value**. **If the existence and business of the LLC are continued** following the termination of a membership interest under § 48-249-503(a) . . . **regardless whether such termination of membership interest was wrongful, any member whose membership interest has so terminated . . . is entitled . . . to receive from the LLC the fair value of the terminated membership interest** as of the date of termination of such membership interest, calculated as set forth in § 48-249-506, in consideration for all such membership interest.

(Emphasis added). In a proceeding to determine the fair value of a membership interest in an LLC, the court:

> (i) Shall enforce any governing terms in the LLC documents as to the amount of fair value and other terms of payment as provided in subdivision (2);
> (ii) In the absence of any such governing terms in the LLC documents, shall determine the fair value of the membership interest, considering, among other relevant evidence, the going concern value of the LLC, any other agreement among any members fixing the price or specifying a formula for determining value of membership interests for any other purpose, the recommendations of an appraiser appointed by the court, if any, the recommendations of any of the appraisers of the parties to the proceeding, and any legal or financial constraints on the ability of the LLC to purchase the membership interest[.]

Tenn. Code Ann. § 48-249-506(3)(B).

Neither the operating agreement nor the LLC Act define the term "fair value." Moreover, "[t]he plain language itself, 'fair value', is not immediately instructive either

- 29 -

because, as other courts have observed, it is 'a term that does not have a commonly accepted meaning in ordinary usage, much less in the business community.'" *Shawnee Telecom Res., Inc. v. Brown*, 354 S.W.3d 542, 551 (Ky. 2011) (citation omitted). Therefore, the resolution of this issue requires us to construe "fair value" under the applicable statutes in the LLC Act, which is a question of law that we review de novo with no presumption of correctness accorded to the trial court's decision. *See Wells v. Tennessee Bd. Of Regents*, 231 S.W.3d 912, 916 (Tenn. 2007).

When construing statutes, our role "is to ascertain and effectuate the legislature's intent." *Kite v. Kite*, 22 S.W.3d 803, 805 (Tenn. 1997). If the language in a statute is unambiguous, "we must apply its plain meaning without a forced interpretation that would limit or expand the statute's application." *State v. Walls*, 62 S.W.3d 119, 121 (Tenn. 2001); *see Gleaves v. Checker Cab Transit Corp.*, 15 S.W.3d 799, 803 (Tenn. 2000) (reasoning that "it is not for the courts to alter or amend a statute"). When the statute is ambiguous, "we may reference the broader statutory scheme, the history of the legislation, or other sources." *Lind*, 356 S.W.3d at 895.

The parties have not cited and we are unaware of any Tennessee cases defining "fair value" under the LLC Act, but the Tennessee Supreme Court has construed the term "fair value" as it is used in dissenters' rights statutes in the Tennessee Business Corporation Act[21]:

> It is worth noting that dissenters' rights statutes use the term "fair value," not "fair market value." "Fair value" in this context is not the same as fair market value. "Fair market value is typically defined as the price at which property would change hands between a willing buyer and a willing seller when neither party is under an obligation to act." "However, in a dissenters' rights action, **the dissenting shareholder is not in the same position as a willing seller on the open market—he is an unwilling seller with little or no bargaining power**." Moreover, "'[f]air value' carries with it the statutory purpose that shareholders be fairly compensated, **which may or may not equate with the market's judgment about the stock's value**. **This is particularly appropriate in the close corporation setting where there is no ready market for the shares and consequently no fair market value.**" Perhaps because minority shareholders in a publicly traded corporation can readily sell their shares for market value, shares that are traded on an

---

[21] A limited liability company is "a hybrid which 'incorporates certain beneficial aspects of a partnership with certain beneficial aspects of a corporation.'" *ARC LifeMed, Inc. v. AMC-Tennessee, Inc.*, 183 S.W.3d 1, 27 (Tenn. Ct. App. 2005) (quoting *Anderson v. Wilder*, E2003-00460-COA-R3-CV, 2003 WL 22768666, at *3-4 (Tenn. Ct. App. Nov. 21, 2003)). Therefore, we may look to relevant case law interpreting the Tennessee Business Corporation Act for guidance. *See id*.

> organized security exchange are not subject to minority shareholders' right to dissent and obtain "fair value."

*Athlon Sports Commc'ns, Inc. v. Duggan*, 549 S.W.3d 107, 119 (Tenn. 2018) (citations omitted) (emphasis added).

Similar to the circumstances addressed by dissenters' rights statutes, the member who sells his or her membership interest in accordance with Tenn. Code Ann. § 48-249-505 "is not in the same position as a willing seller on the open market," because the company is purchasing the membership interest pursuant to a judicially-ordered sale. *See id*. Moreover, a limited liability company, like a close corporation, is privately owned, and thus, the market is often irrelevant. *See* Sandra K. Miller, *What Remedies Should be Made Available to the Dissatisfied Participant in a Limited Liability Company*, 44 Am. U. L. Rev. 465, 527 (1994).[22] Accordingly, we conclude that, in the context of Tenn. Code Ann. § 48-249-505, "fair value" is not "the price at which property would change hands between a willing buyer and a willing seller." *See Athlon Sports Commc'ns*, 549 S.W.3d at 119.

While the applicable statutes do not explicitly define "fair value," Tenn. Code Ann. § 48-249-506 provides that "the going concern value of the LLC" constitutes relevant evidence of fair value. Consistent with the language in our statute, the Delaware Supreme Court defined "fair value" in Delaware's Corporation Act as the shareholder's proportionate interest in the business valued as a going concern. *Tri-Cont'l Corp. v. Battye*, 74 A.2d 71, 72 (Del. 1950); *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1144 (Del. 1989). By using the term "fair value" rather than "fair market value" and by specifically listing the going concern value of the LLC as relevant evidence, the General Assembly expressed its intent that fair value should, generally, be determined based on the value of the business as a going concern and not the market price.[23] *See Athlon Sports Commc'ns*, 549 S.W.3d at 119. Therefore, we shall apply Delaware's definition of fair value and hold that fair value pursuant to Tenn. Code Ann. §§ 48-249-505 to -506 is the member's

---

[22] Miller writes that because "[t]he limited liability company acts largely as a vehicle for the conduct of a wide variety of [privately-owned] small businesses, . . . the remedies fashioned in response to the problems of fraud, oppression, or prejudice faced by minority shareholders of close corporations are highly relevant in the context of limited liability companies."

[23] The foregoing notwithstanding, we do not hold that the statute necessarily precludes market data in determining the fair value of the membership interest because the statute does not limit relevant evidence of fair value to the evidence listed therein. *See* Tenn. Code Ann. § 48-249-506 (In the proceeding brought to determine fair value, the court "shall determine the fair value of the membership interest, **considering, among other relevant evidence** . . . the recommendations of any of the appraisers of the parties to the proceeding . . . ." (Emphasis added)). Valuation experts may find that market data is useful in determining the going concern value of an LLC.

proportionate interest in the company valued as a going concern. *See Tri-Cont'l Corp.*, 74 A.2d at 72; *see also Athlon Sports Commc'ns*, 549 S.W.3d at 122.[24]

### 2. Discounts for Lack of Marketability and Control

Brinkman contends that discounts for lack of marketability and control are relevant to determining the value of Raley's interest because Raley should not receive more for his interest than he could have received had he sold it to a third party. Additionally, Brinkman argues that, considering Raley's wrongful conduct, failing to apply discounts to Raley's membership interest would "offend the fundamental concepts of fairness and equity that this court is bound to consider" in determining "fair value." In response, Raley contends that a vast majority of jurisdictions have concluded that "fair value," does not encompass discounts for lack of marketability or control.

For many years, courts equated "fair value" with "fair market value," and as an appraisal remedy under their dissenters' rights statutes, identified a quasi-market price for the dissenting shareholder's block of shares. *Shawnee Telecom*, 354 S.W.3d at 554. Because a non-controlling block of shares would sell for less, courts sometimes applied a discount for lack of control, also known as a minority discount. *Id*. And similarly, courts applied a discount for marketability to account for the fact that the shares in a privately-held corporation had no ready market. *Id*. Significantly, courts applied these discounts at the shareholder level and not at the entity level.[25] *Id*.

This practice began to change in 1989 with the Delaware Supreme Court's decision in *Cavalier Oil Corporation v. Harnett*. *Id.* at 554–55. There, the Delaware Supreme Court reasoned:

> The application of a discount to a minority shareholder is contrary to the requirement that the company be viewed as a "going concern" . . . . Where there is no objective market data available, the appraisal process is not intended to reconstruct a pro forma sale but to assume that the shareholder was willing to maintain his investment position, however, slight, had the merger not occurred. Discounting individual shareholdings injects into the

---

[24] The Tennessee Supreme Court adopted the holding in *Weinberger v. UOP, Inc.*, 457 A.2d 701, 712 (Del. 1983), determining that the Delaware Block Method was not the exclusive method of valuing a dissenting shareholder's interest in a corporation. Significantly, *Weinberger* based its determination on its definition of "fair value," which is the shareholder's proportionate interest in the corporation valued as a going concern. *Weinberger*, 457 A.2d at 712.

[25] Shareholder-level discounts are "discounts that apply to share value"; entity-level discounts apply to "the value of the company as a whole." *Shawnee Telecom Res., Inc.*, 354 S.W.3d at 554 (citing Shannon P. Pratt, *Business Valuation Discounts and Premiums* 3 (2001)). Only entity-level discounts are "meant to account for factors that affect the value of the going concern." *Id*.

appraisal process speculation on the various factors which may dictate the marketability of minority shareholdings. More important, to fail to accord to a minority shareholder the full proportionate value of his shares imposes a penalty for lack of control, and unfairly enriches the majority shareholders who may reap a windfall from the appraisal process by cashing out a dissenting shareholder, a clearly undesirable result.

564 A.2d at 1145. The Court also noted that, because the corporation's lack of marketability can be accounted for at the entity level, there is no need to "apply further weighing factors at the shareholder level." *Id*. at 1144.

Since *Cavalier Oil*, a majority of courts disallow shareholder-level discounts when fashioning an appraisal remedy pursuant to dissenters' rights statutes because (1) shareholder-level discounts are antithetical to viewing the company as a going concern, (2) the discounts are contrary to valuing the company as a whole, or at the entity-level, and (3) discounts for marketability and lack of control would have an undesired effect of merely transferring, without compensation, a portion of the minority interest to the majority. *Shawnee Telecom*, 354 S.W.3d at 555.

Reflecting the view of a majority of jurisdictions, the American Law Institute provides:

> **(a)** The fair value of shares under § 7.21 (Corporate Transactions Giving Rise to Appraisal Rights) should be the value of the eligible holder's proportionate interest in the corporation, **without any discount for minority status or, absent extraordinary circumstances, lack of marketability….**

2 ALI Principles, § 7.22, at 302[26] (emphasis added).

---

[26] "Extraordinary circumstances" are further explained in comment (e) to § 7.22(a), at 312, which reads in pertinent part:

> Under a very limited exception to the principles set forth in § 7.22(a), the court may determine that a discount reflecting the lack of marketability of shares is appropriate in "extraordinary circumstances." Such circumstances require more than the absence of a trading market in the shares; rather, the court should apply this exception only when it finds that the dissenting shareholder has held out in order to exploit the transaction giving rise to appraisal so as to divert value to itself that could not be made available proportionately to other shareholders….[I]t would be inappropriate to apply a marketability discount…if the shareholder was dissenting to a fundamental corporate change such as a merger, rather than a relatively minor matter.

Here, the trial court found that extraordinary circumstances did not exist.

Because limited liability companies are relatively new, there is very little case law addressing shareholder-level discounts as a part of an appraisal remedy pursuant to states' LLC Acts. *See* Sandra K. Miller, *Discounts and Buyouts in Minority Investor LLC Valuation Disputes Involving Oppression and Divorce*, 13 U. Pa. J. Bus. L. 607, 621 (2011). That said, the circumstances addressed by dissenters' rights statutes are similar to those addressed by the LLC Act because each provide for a judicially-ordered sale at "fair value," and the primary purpose is to compensate a member for the "involuntary deprivation of an investment." *See* Miller, *supra,* at 639; *see also* Tenn. Code Ann. § 48-249-505.

As we concluded in the previous section, under § 48-249-506, fair value is ascertained by determining the member's proportionate interest in the company valued as a going concern. Therefore, the appraisal process under § 48-249-505 and -506 does not seek "to reconstruct a pro forma sale but to assume that the shareholder was willing to maintain his investment position." *See Cavalier Oil*, 564 A.2d at 1145. Because discounts for lack of control and marketability are premised on a theoretical sale to a third party, they are contrary to the foregoing principles.

Moreover, a shareholder-level discount for lack of control is unnecessary because, under the applicable statutes, it is the company, not a third party, who is buying the membership interest. *See Charland v. Country View Golf Club, Inc*., 588 A.2d 609, 612 (R.I. 1991) ("When a corporation elects to buy out the shares of a dissenting shareholder, the fact that the shares are noncontrolling is irrelevant."); *see also Hansen v. 75 Ranch Co*., 957 P.2d 32, 41 (Mont. 1998). And a shareholder-level discount for marketability is equally unnecessary because, when valuing the company at the entity level, courts and valuation experts can and do account for the company's lack of marketability. *Cavalier Oil*, 564 A.2d at 1144; *see Brown v. Brown*, 792 A.2d 463, 475 (N.J. App. Div. 2002).[27] Therefore, these discounts have the undesired effect of merely transferring, without compensation, a portion of the member's interest to the company. *Shawnee Telecom*, 354 S.W.3d at 555. As such,

---

[27] For example, when applying the income approach to valuation, valuation experts consider lack of marketability when calculating the capitalization rate:

> There is a recognized risk of double-counting by an expert, that is, of duplicative reductions in the value of a minority interest in a closely-held business, as a result of increasing the capitalization rate (and decreasing the valuation multiple) to account for limited marketability, and then in addition applying a "marketability discount" to the value derived from capitalizing income.

*Brown*, 792 A.2d at 475.

they impose a penalty on the member whose interest has been terminated. *Cavalier Oil*, 564 A.2d at 1145.

Brinkman acknowledges the punitive effect of these discounts but argues that it is appropriate in this case considering Raley's wrongful conduct. He relies on a New Jersey Supreme Court decision, *Balsamides v. Protameen Chemicals*, *Inc*., 734 A.2d 721, 738 (N.J. 1999), wherein the Court determined that the discount for marketability was necessary to deter the seller's oppressive conduct. But this is not the purpose of the appraisal remedy as outlined in Tenn. Code Ann. § 48-249-505, which provides:

> If the existence and business of the LLC are continued following the termination of a membership interest under § 48-249-503(a) . . . **regardless whether such termination of membership interest was wrongful**, any member whose membership interest has so terminated . . . is entitled . . . to receive from the LLC the fair value of the terminated membership interest. . . .

(Emphasis added).

Therefore, we hold that under § 48-249-506, fair value is ascertained by determining the member's proportionate interest in the company valued as a going concern. *Id*. § 505(3)(b)(ii). This means that the appraisal process under § 48-249-505 and -506 does not seek "to reconstruct a pro forma sale but to assume that the shareholder was willing to maintain his investment position." *See Cavalier Oil*, 564 A.2d at 1145. As such, the term "fair value" in Tennessee's LLC Act does not comport with shareholder-level discounts for lack of marketability or control. Accordingly, we affirm the decision of the trial court to exclude these discounts in determining the fair value of Raley's membership interest.

## D. TAX-AFFECTING

Brinkman contends that Mr. Price's application of a corporate tax to 4 Points' income stream ("tax-affecting") was appropriate when valuing 4 Points because an S corporation's income is taxed on its owners' individual tax returns. Additionally, he contends that valuation experts commonly use after-tax income values to calculate the capitalization rate under the income approach to valuation. For these reasons, he contends the trial court erred when it determined, as a matter of law, that tax-affecting did not constitute relevant evidence of the fair value of Raley's membership interest in 4 Points in accordance with Tenn. Code Ann. § 48-249-506. In response, Raley argues that the application of a corporate income tax is inappropriate, as a matter of law, because the S corporation does not pay a corporate income tax.

The income approach to valuation, which is most applicable here, "uses either the direct capitalization method or the [discounted cash flow] method to convert the anticipated

economic benefits that the holder of the interest would stand to realize into a single present-value amount." *Estate of Jones v. Comm'r of Internal Revenue*, T.C. Memo. 2019-101, 2019 WL 3913293, at \*10 (Aug. 19, 2019). The problem with applying the income approach to the valuation of an S corporation is that the approach "is structured to discount cash flows of C corporations," which are taxed at the entity level and at the shareholder level. *See* Courtney Sparks White, *S Corporations: A Taxing Analysis of Proper Valuation*, 37 Cap. U. L. Rev. 1117, 1119 (2009). As Raley correctly pointed out, an S corporation's income is taxed only at the shareholder level. *Id*. at 1122; *see also, generally*, 26 U.S.C.A. § 1366. The difficulties of applying the income approach to the valuation of an S corporation has led one court to comment that "the science of valuing closely held [S corporations] usually results in a 'gross terminal logical [sic] inexactitude.'" *Jones*, 2019 WL 3913293, at \*14 (quoting Winston Churchill).

The foregoing notwithstanding, our task, here, is not to determine the most accurate way to value 4 Points. Our task is to decide whether tax-affecting constitutes relevant evidence of its fair value. According to Tennessee Rule of Evidence 401, relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Stated another way, relevant evidence is any evidence that assists the court in resolving a question of fact. *White v. Beeks*, 469 S.W.3d 517, 527 (Tenn. 2015). That said, our decision is guided by Tenn. Code Ann. § 48-249-506, which provides that "the going concern value of the LLC" and "the recommendations of any of the appraisers of the parties to the proceeding" are relevant to the fair value determination.

## 1. Going Concern Value of the LLC

The trial court held that "no entity level tax should be applied in the valuation analysis for a non-controlling interest in an electing S corporation, absent a compelling demonstration that independent third parties dealing at arms-length would do so as part of a purchase price negotiation." Thus, the trial court applied the fair market value standard. In reaching its decision, the trial court relied, in part, on *Gross v. Commissioner of Internal Revenue*, 78 T.C.M. (CCH) 21, 1999 WL 549463 (T.C. 1999), *aff'd Gross*, 272 F.3d 333 (6th Cir. 2001).

The court's task in *Gross* was to determine the fair market value of shares in an S corporation for gift tax purposes. *Id.* at \*3. In *Gross*, one expert applied a 40% C corporation tax rate to the subject corporation's income, and the other expert applied a zero percent tax rate in an attempt to account for the tax benefits of the S corporation. *Id*. Presented with two extremes—a zero percent tax rate and a 40% tax rate—the court chose to apply the zero percent tax rate, because it more accurately reflected the tax attributes of an S corporation. *Id*. at \*10–11. In so doing, the court did not hold that tax-affecting was irrelevant in determining the value of an S corporation. The court merely decided not to tax-affect based on the limited evidence it had before it.

Here, in deciding that tax-affecting was irrelevant, the trial court applied the fair market value standard, as the *Gross* court did. However, the correct standard to be applied in this case is the fair value standard. To better appreciate tax-affecting as it relates to the fair value standard, we turn to the decision of the Delaware Chancery Court in *Delaware Open MRI Radiology Associates, P.A. v. Kessler*, 898 A.2d 290 (Del. Ch. 2006). Because the court's task in *Kessler* was to determine the going concern value of an S corporation, we find it more persuasive than *Gross*. *Kessler*, 898 A.2d at 327.

In *Kessler*, the trial court considered the "proper manner to tax affect the earnings" of an S corporation. *Id*. at 326. One expert witness used tax-affecting as if the business were a C corporation, and the other did not tax-affect the earnings at all. *Id.* The court ultimately concluded "that neither of the experts [took] the most reasonable approach to valuing [the business]." *Id*.

The court in *Kessler* reasoned that application of the corporate tax rate denied the sellers of "the value they would have received as continuing S corporation stockholders in [the corporation] and, therefore, ensured that the merger price was lower than fair value." *Id*. at 327. On the other hand, **the court noted that the "failure to tax affect [the corporation]'s earnings at all result[ed] in an artificial inflation of the value of S corporation status**." *Id*. (emphasis added). More specifically, the court explained:

> The Internal Revenue Code states that "[t]he taxable income of an S corporation shall be computed in the same manner as in the case of an individual...." This tax, though assessed at individual rather than corporate tax rates, is dependent solely upon the corporation's net earnings. Even if Delaware Radiology were to retain 100% of its earnings annually, its stockholders still would owe taxes on Delaware Radiology's income even though they received no distributions. Affording a remedy to the Kessler Group that denies the reality that each shareholder owes taxes on his proportional interest in Delaware Radiology would result in the Kessler Group receiving a higher per share value from the court than it could ever have realized as a continuing shareholder.

*Id*. at 328 (footnote omitted).

The court "recognized that an S corporation structure can produce a material increase in economic value for a stockholder and should be given weight in a proper

- 37 -

valuation of the stockholder's interest." *Id*. at 327. Ultimately, the court applied an effective tax rate of 29.4% to Delaware Radiology's earnings.[28] *Id*. at 330.

The Delaware Chancery Court's reasoning in *Kessler* has persuaded us that evidence of tax-affecting was relevant to the present case. As in *Kessler*, the trial court's task in this case was to determine "the going concern value in an S corporation." *See id.* at 327. Because the shareholder or member pays taxes on the corporation's income via his or her individual returns, tax-affecting would assist the court in determining "what the investor ultimately can keep in his pocket," assuming the investor maintains his investment position. *Id*. at 327–28 (quoting *In re Radiology Assocs*., 611 A.2d 485, 495 (Del. Ch. 1991)). Thus, tax-affecting assists the court in determining the going concern value of the S corporation to the shareholder or member.

## 2. Recommendations of Appraiser

Under Tenn. Code Ann. § 48-249-506, "the **recommendations of any of the appraisers of the parties to the proceeding**" constitutes relevant evidence of fair value. (emphasis added). Mr. Price's affidavit established that tax-affecting is a generally accepted factor for determining the fair value of an S corporation, and it is relevant to the fair value of Raley's membership interest in 4 Points. According to the affidavit of Mr. Price—a certified public accountant and certified valuation analyst who was also certified in financial forensics and accredited in business valuation—his valuation model used an income based on after-tax values because his capitalization rate was based on after-tax values. Thus, application of a tax to 4 Points' income was necessary to compare "apples to apples." He opined that it would be inappropriate "to inflate the income stream by disregarding taxes but depress the Capitalization Rate by considering taxes."

Significantly, Mr. Price's methodology is consistent with that of the U.S. Tax Court. For example, when the *Gross* court applied a zero percent tax rate to the subject corporation's income, it also disregarded taxes when calculating the discount rate. *Gross*, 1999 WL 549463, at *11. In so doing, the court opined that if "in determining the present value of any future payment, the discount rate is assumed to be an after-shareholder-tax rate of return, *then the cash-flow should be reduced ('tax affected')* to an after-shareholder-tax amount." *Id.* (emphasis added). And in a more recent case, *Jones*, the U.S. Tax Court noted that, in order to accurately value a pass-through entity, it was important to treat the cash flow and the discount rate consistently by using after-tax or pre-tax values

---

[28] The Delaware Chancery Court's approach is similar to an accepted method of valuation of minority interests in S corporations called the Van Vleet model. *See* Charles J. Russo & James A. DiGabriele, "Impact of the Tax Cuts and Jobs Act on the Valuation of S Corporations," *Journal of Forensic & Investigative Accounting*, Vol. 10: Issue 2, Special Issue 2018.

for both. 2019 WL 3913293, at *11 n.5. Therefore, we find that, for the purpose of correlation, tax-affecting was relevant to the fair value determination of 4 Points.

While we have determined that tax-affecting was relevant in this case, we do not suggest the use of one valuation methodology over another. As previously stated, our task is not to decide the most accurate way to value 4 Points. We only hold that evidence of tax-affecting should be "part of the factual mix and weighed as such." *See Weinberger*, 457 A.2d at 714. Generally, valuation "is a question of fact," *Wallace v. Wallace*, 733 S.W.2d 102, 107 (Tenn. Ct. App. 1987), and it is incumbent on the trial court to "weigh all relevant evidence of value and draw appropriate inferences." *Kress v. United States*, 382 F. Supp. 3d 820, 831 (E.D. Wis. 2019) (quoting *Estate of Adell v. Comm'r of Internal Revenue*, 108 T.C.M. (CCH) 107, 2014 WL 3819046, at *42 (T.C. 2014)). On remand, the trial court may place a value on Raley's interest in 4 Points "that is within the range of evidence submitted." *See Wallace*, 733 S.W.2d at 107.

Therefore, we vacate the trial court's judgment valuing Raley's membership interest in 4 Points and remand to allow the parties to present evidence relative to tax-affecting.

E. ATTORNEYS' FEES

Brinkman contends he is entitled to attorneys' fees pursuant to section 24 of the operating agreement and pursuant to Tenn. Code Ann. §§ 48-249-804 and -805.

Tennessee adheres to the American rule, which provides that litigants are responsible for their own attorneys' fees unless "(1) a contractual or statutory provision creates a right to recover attorney fees; or (2) some other recognized exception to the American rule applies. . . ." *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009). Brinkman claims both a contractual and a statutory right to attorneys' fees; therefore, we will consider each in turn.

1. Contractual Claim

The trial court summarily dismissed Brinkman's claim for attorneys' fees under the operating agreement, construing the relevant provision in the agreement to provide for attorneys' fees only if the parties submitted the dispute to arbitration. Brinkman argues that, because Raley chose to file suit in chancery court, he waived any right to contend that section 24 of the operating agreement did not apply. Raley contends that section 24 of the operating agreement clearly provides that attorneys' fees are only warranted when the dispute is submitted to arbitration, and neither party moved the court to compel arbitration.

This court reviews a trial court's decision on a motion for summary judgment de novo without a presumption of correctness. *Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015). Accordingly, this court must make a fresh

determination of whether the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Id.* In so doing, we consider the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002). The issue presented here is a question of law because the material facts are undisputed.

Our Supreme Court holds that "[i]n the context of contract interpretation, Tennessee allows an exception to the American rule only when a contract *specifically* or *expressly* provides for the recovery of attorney fees." *Cracker Barrel*, 284 S.W.3d at 309 (emphasis in original). Thus, a litigant has a contractual right to attorneys' fees under the particular circumstances specified in the contract. *See Individual Healthcare Specialists*, 566 S.W.3d at 704.

Section 24 of 4 Points' operating agreement states:

**24. DISPUTE RESOLUTION**

If a dispute between the Partners arises under this Agreement, such dispute shall be settled by arbitration in accordance with the rules for commercial arbitration of the American Arbitration Association (or similar organization)….

The prevailing Partner shall be awarded all of its attorneys' fees and related costs. The non-prevailing party shall bear all cost of the arbitration proceeding including any amounts paid for subpoenas, depositions, transcripts and witness fees….

Like the trial court, we construe section 24 to award attorneys' fees to the prevailing party in the context of an arbitration proceeding. Considering that the primary goal of arbitration is to avoid the expense and delay of ordinary litigation, *Arnold v. Morgan Keegan & Co.*, 914 S.W.2d 445, 449 (Tenn. 1996), the trial court correctly reasoned that "the assumptions and premise on which recovery of attorney's fees was agreed to by the parties in section 24 of the Partnership Agreement are not present in this litigation."

Relying on *Meyer v. Hatto*, 198 P.3d 552 (Wyo. 2008), Brinkman argues that, because Raley filed this action in chancery court, rather than submit it to arbitration, it would be inequitable to allow Raley to avoid the attorneys' fees provision. In *Meyer*, the court dismissed the plaintiffs' case for lack of personal jurisdiction, and the defendants claimed they were entitled to attorneys' fees under the contract. *Id*. at 558. Similar to this case, however, the contract between the parties provided for attorneys' fees if the dispute was submitted to arbitration. *Id*. Thus, the plaintiffs argued that the defendants were not entitled to attorneys' fees. *Id*. But the Wyoming Supreme Court held that the plaintiffs

"could not use their attempt to litigate instead of arbitrate as a shield against the attorney's fees and other expenses provision of the arbitration clause." *Id*.

In essence, Brinkman asks this court to apply equitable principles to rewrite the operating agreement. "However, the strong strain of textualism in Tennessee caselaw demonstrates resolve to keep the written words as the lodestar of contract interpretation." *Individual Healthcare Specialists*, 566 S.W.3d at 694. In Tennessee, the parties cannot use the courts as "a fallback mechanism . . . to 'make a new contract'" when, under the circumstances, they suddenly become dissatisfied with their agreement. *Id*.

Therefore, we affirm the trial court's decision to summarily dismiss Brinkman's claim for attorneys' fees under the operating agreement.

## 2. Statutory Claims

Brinkman also seeks to recover his attorneys' fees pursuant to Tenn. Code Ann. §§ 48-249-804(a), -804(b), and -805. He contends he is entitled to statutory attorneys' fees because he "overwhelmingly" prevailed in the litigation and recovered, on behalf of 4 Points, its valuable intellectual property and $315,551.86 in non-Pharmacy-related expenses. He also contends he is entitled to attorneys' fees because Raley breached his fiduciary duty in violation of the LLC Act, costing Brinkman and 4 Points hundreds of thousands of dollars, and Brinkman has not been made whole as a result of the litigation. This is because, while Brinkman proved that Raley was liable for $961,819 in damages as a result of the breach, Brinkman incurred legal and expert witness fees of approximately one million dollars.

Raley argues that Brinkman did not "overwhelmingly" prevail because Raley also recovered on behalf of 4 Points by succeeding on his claim for Brinkman's $175,000 capital contribution and by successfully defending against Brinkman's claim to a reserve fund as part of the salary agreement. Raley also notes that the court did award some relief to Brinkman in accordance with § 48-249-805, and by doing so, the trial court acted within its discretion.

Because Tenn. Code Ann. §§ 48-249-804 and -805 state that the trial court "may" award attorneys' fees, whether to award attorneys' fees is within the sound discretion of the trial court, subject only to the specific limitations outlined in each statute. *See Rock Ivy Holding, LLC v. RC Properties, LLC*, 464 S.W.3d 623, 644 (Tenn. Ct. App. 2014). Therefore, we review the trial court's decision to grant or deny attorneys' fees pursuant to these statutes under the abuse of discretion standard discussed earlier. *Id*.

(a) Tenn. Code Ann. § 48-249-804(a).

Tennessee Code Annotated section 48-249-804(a) provides that on termination of a derivative proceeding, "the court may require the plaintiff to pay any defendant's reasonable expenses, including attorneys' fees, incurred in defending the proceeding, if it finds that the proceeding was commenced without reasonable cause." A plaintiff acts without reasonable cause if "(1) plaintiff's claims in the lawsuit are not warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; or (2) plaintiff's allegations in the suit are not well grounded in fact after reasonable inquiry." *Rock Ivy Holding, LLC*, 464 S.W.3d at 645 (quoting *Brady v. Calcote*, No. M2003-01690-COA-R3-CV, 2005 WL 65535, at *8 (Tenn. Ct. App. Jan. 11, 2005)).

Although Raley did not prevail on all of his claims following the trial, the trial court determined that it was necessary for Raley to file his action because the parties disputed the terms of the salary, lease, and operating agreements, and as a consequence, could not effectively operate the business together. The court found in favor of Raley on his claim that Brinkman breached the operating agreement by failing to make a capital contribution. The court also found that Brinkman caused confusion regarding 4 Points' rent obligation and that both parties were mistaken about the terms of their salary agreement.

We have determined that the factual basis for the trial court's findings is properly supported by evidence, and the court properly identified and applied the applicable legal principles. The record supports the trial court's determination that Raley had reasonable cause to file his action. Accordingly, we affirm the trial court's decision to deny Brinkman's claim for attorneys' fees in accordance with Tenn. Code Ann. § 48-249-804(a).

(b) Tenn. Code Ann. § 48-249-804(b)

Tennessee Code Annotated, section 48-249-804(b) provides in pertinent part:

If a derivative proceeding is successful in whole or in part, or if anything is received by the plaintiff as a result of a judgment, compromise or settlement of any such proceeding, the court may award the plaintiff its reasonable expenses, including reasonable attorneys' fees.

When Brinkman moved the trial court to alter or amend its July 2017 order, he requested that the court include an award for attorneys' fees under Tenn. Code Ann. § 48-249-804(b). The trial court denied Brinkman's request, reasoning:

[T]he record established that as to Defendant Brinkman recovering $371,244.79 in underpaid salary and $227,445.33 in distributions, that inures to him personally. Thus, of the total findings of mispayments by Plaintiff Raley of $914,241.98, only $240,275.59 or 26% inure to the benefit of the LLC. The greatest percentage, 74% is recovery to Brinkman individually and $18,500 to his company, Brinkman Holdings, LLC as Landlord.

- 42 -

….[Brinkman] has been found to have been mistaken about the existence, as part of the salary agreement, of a 4% reserve fund for future development, that would have cost the LLC hundreds of thousands of dollars to fund. Also there is the $175,000 that Plaintiff Brinkman has to pay as a capital contribution which was recovered for the LLC by Plaintiff Raley for breach of contract.

Furthermore, Defendant Brinkman sought the remedy of expelling Plaintiff Raley. That remedy comes with the risk of lower performance by the business in the future. Defendant Brinkman did not seek the remedy for Plaintiff Raley to buy Brinkman's membership which would have eliminated future performance risk to Brinkman.

The record supports the trial court's determination that "[t]he greatest percentage, 74% is recovery to Brinkman individually and $18,500 to his company, Brinkman Holdings, LLC as Landlord," not to 4 Points. Moreover, although the derivative claim was successful in part, and "something was received by the plaintiff as a result of a judgment," the trial court had the discretion to award attorneys' fees under those circumstances. *See* Tenn. Code Ann. § 48-249-804(b). Having concluded that the factual basis for the trial court's findings is properly supported by the evidence and the court properly identified and applied the applicable legal principles, we affirm the trial court's decision to deny Brinkman's claim for attorneys' fees in accordance with Tenn. Code Ann. § 48-249-804(b).

(c) Tenn. Code Ann. § 48-249-805.

Tennessee Code Annotated, section 48-249-805 affords the trial court the discretion to award equitable relief in the form of attorneys' fees and expenses in the event one of the members of the LLC violates a provision in the LLC Act. Specifically, it provides:

If an LLC, or any officer, manager, director or member, as applicable, of the LLC, or other person with the authority to act for the LLC, violates a provision of this chapter, a court in this state may, in a proceeding brought by a member or holder of financial rights of the LLC, grant any equitable relief it considers just and reasonable in the circumstances, and, award expenses, including attorneys' fees and disbursements, to the member or holder of financial rights, as applicable.

*Id*.

- 43 -

The trial court found that, although Brinkman proved that Raley breached his fiduciary duty and was liable for over $900,000 in damages, only $240,275.59[29] of that amount inured to the benefit of 4 Points. Nevertheless, the trial court acknowledged that "as a 50% member of the LLC, Brinkman receives only 50% value for the LLC recovery at trial yet bears 100% of the cost of the recovery." Thus, the court exercised its discretion under Tenn. Code Ann. § 48-249-805 to allow half of $240,275.59 to be paid to Brinkman individually. Finding no error, we affirm the trial court's decision.

## F. PREJUDGMENT AND POST-JUDGMENT INTEREST

Brinkman contends the trial court erred by not awarding prejudgment interest or post-judgment interest. He contends he properly raised the request in his Third Amended Counterclaim in the general prayer for relief. Raley argues Brinkman waived the issues by failing to properly raise them.

1. Prejudgment Interest.

The decision to award prejudgment interest is discretionary and controlled by Tenn. Code Ann. § 47-14-123, which provides:

> Prejudgment interest, i.e., interest as an element of, or in the nature of, damages, as permitted by the statutory and common laws of the state as of April 1, 1979, may be awarded by courts or juries in accordance with the principles of equity . . . .

The Tennessee Supreme Court has held that a prayer for general relief is sufficient to raise the issue of prejudgment interest. *Mitchell v. Mitchell*, 876 S.W.2d 830, 831 (Tenn. 1994). However, Rule 36(a) of the Tennessee Rules of Appellate Procedure provides:

> Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.

The trial court did not address prejudgment interest in its orders following the trial. Therefore, it was incumbent upon Brinkman to bring that issue to the trial court's attention. Brinkman filed a motion to alter or amend the order with regard to attorneys' fees and liability for punitive damages, but he did not raise the issue of prejudgment interest.[30]

---

[29] As previously stated, this amount does not include the $75,276.27 Brinkman repaid prior to the trial.

[30] In his brief, Brinkman does not cite to the record showing where he brought the error to the trial court's attention, and we find nothing in the record to indicate that he did.

Because Brinkman did not take "whatever action was reasonably available to prevent or nullify" the alleged error, we consider the issue waived. *See* Tenn. R. App. P. 36(a).

2. Post-Judgment Interest.

The award of post-judgment interest is controlled by Tenn. Code Ann. § 47-14-122, which provides:

> Interest shall be computed on every judgment from the day on which the jury or the court, sitting without a jury, returned the verdict without regard to a motion for a new trial.

"The purpose of post-judgment interest is to compensate a successful plaintiff for being deprived of the compensation for its loss between the time of the entry of the judgment awarding the compensation until the payment of the judgment by the defendants." *State v. Thompson*, 197 S.W.3d 685, 693 (Tenn. 2006) (quoting *Varnadoe v. McGhee*, 149 S.W.3d 644, 649 (Tenn. Ct. App. 2004)). Interest on judgments in Tennessee is statutorily mandated. *See* Tenn. Code Ann. § 47-14-121. "The failure of any court to expressly provide such interest in its judgment does not abrogate the statute." *Tallent v. Cates*, 45 S.W.3d 556, 563 (Tenn. Ct. App. 2000) (citing *Inman v. Inman*, 840 S.W.2d 927, 932 (Tenn. Ct. App. 1992)).

Therefore, on remand, the trial court should award post-judgment interest in accordance with the statute.

## G. ATTORNEYS' FEES ON APPEAL

Both parties request attorneys' fees on appeal in accordance with the operating agreement and/or the LLC Act. We decline to award attorneys' fees to either party on appeal for the same reasons we affirmed the trial court's decision to deny attorneys' fees in the trial court. Thus, we have determined that: (1) because the operating agreement only allows attorneys' fees in the context of an arbitration proceeding, neither party has a contractual right to attorneys' fees; (2) Raley had reasonable cause to file this action, and Brinkman had reasonable cause to file this appeal; therefore, we decline to award either his attorneys' fees in accordance with Tenn. Code Ann. § 48-249-804(a); and (3) on appeal, like in the trial court, each party prevailed on some issues and not on others, *id* at § 804(b). Moreover, neither party provided reasoning or authority to support his entitlement to attorneys' fees on appeal in accordance with Tenn. Code Ann. § 48-249-805, and we see no reason to award equitable relief under that statute. Thus the parties will be responsible for their own attorneys' fees on appeal.

## IN CONCLUSION

The judgment of the trial court is affirmed in part, vacated in part, and this matter is remanded for further proceedings consistent with this opinion. Costs of appeal are assessed equally against Terrell K. Raley and Cees Brinkman.

_____
FRANK G. CLEMENT JR., P.J., M.S.